UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| WILLIAM COOGLE, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 5: 20-137-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| ANDREW SAUL, | ) | **MEMORANDUM OPINION** |
| Commissioner of Social Security, | ) | **AND ORDER** |
| | ) | |
| Defendant. | ) | |

\*\*\*  \*\*\*  \*\*\*  \*\*\*

The plaintiff seeks judicial review of the Commissioner of Social Security's denial of his application for disability insurance benefits. However, contrary to the plaintiff's claims, the Commissioner's decision is supported by substantial evidence and is based on a proper application of the law. As a result, the Commissioner's final decision will be affirmed.

**I.**

Plaintiff William Coogle ("plaintiff" or "Coogle") filed an application for disability insurance benefits ("DIB") on April 26, 2016. [*See* Administrative Transcript, hereafter "Tr.," 157.] His application was disapproved initially and on reconsideration. [Tr. 94, 99] Coogle thereafter requested a hearing before an administrative law judge ("ALJ"). [Tr. 106] ALJ Robert Bowling held an administrative hearing by video on October 18, 2018. The ALJ issued a written decision denying benefits on December 24, 2018. [Tr. 35-65; 10-20] The ruling became the Commissioner's final decision when the Appeals Council denied the plaintiff's request for review on January 28, 2020. [Tr. 1-3] Thus, this matter is ripe for judicial review. *See* 42 U.S.C. § 405(g).

## II.

Coogle was 48-years-old at the time of the ALJ's decision.  He lived with his wife, teenage son, father-in-law, and mother-in-law in Georgetown, Kentucky.  [Tr. 40]  Coogle alleges that he became unable to work on January 6, 2015, when he was 44-years-old, due to a heart attack, hip and back pain, and a subsequent heart attack.  Prior to that date, he worked on the production line at Toyota Motor Manufacturing for approximately 15 years.  [Tr. 41-42] Coogle held a bachelor's degree in marketing and had worked in that field prior to working at Toyota.

Coogle reported that his hip and back pain commenced after his first heart attack in 2015. He reported that the pain was constant but worsened with activity.  [Tr. 198]   In particular, Coogle complained that he was unable to sit or stand for more than 15 minutes at a time and he experienced severe swelling in his legs and feet.  [Tr. 176]  The necessary rest period "could be anywhere from 15-30 minutes to a couple of days."  [Tr. 182]  He also reported having difficulty falling and staying asleep and believed that he only got a few hours of uninterrupted sleep per night.  [Tr. 177]  Coogle had a driver's license and drove several times per week.  [Tr. 40]  He was 6'4" tall and weighed approximately 400 pounds.  [Tr. 188]

Coogle reported that pain medications helped relieve his pain somewhat, but it made him sleepy.  [Tr. 199]  He also used a TENS unit, but the relief from that device was short lived.  He used to do most of the chores and cooking at home, but was no longer able to perform these tasks because of his pain.  [Tr. 199-200]  Coogle had a second heart attack in August 2016 after temporarily discontinuing his anticoagulant medication so that he could undergo a spinal nerve ablation procedure.

The plaintiff's medical records are summarized as follows:  Coogle has a history of supraventricular tachycardia for which he underwent an ablation on November 6, 2013.  [Tr. 872]  He presented to the emergency department at Georgetown Hospital complaining of chest pain on January 5, 2015.  Coogle was then transported to the University of Kentucky Medical Center where he underwent a heart catheterization.  The catherization revealed 100 percent occlusion of the mid-left anterior descending artery.  The blockage was treated with two overlapping drug-eluting stents.  [Tr. 866]  The treatment plan included medication and "aggressive risk factor modification."  *Id.*

By July 2015, Coogle had commenced a work conditioning program.  [Tr. 285] However, he had difficulty with the program and was only able to walk on the treadmill for 7 minutes before his heart rate elevated to the 120s.  He also complained of lower leg edema. Maria Reyes, M.D., a physician at Toyota, diagnosed him with low back pain and morbid obesity.  She encouraged physical therapy and an exercise program.  [Tr. 282-83]

Lee Ann Brewer, APRN, (who Coogle identified as his primary care provider), referred him to sports medicine physician Kelly Evans-Rankin, M.D., at the University of Kentucky, for low back pain on August 18, 2015.  [Tr. 302-06]  Coogle advised Rankin that he had bilateral low back pain that was worse on the right side.  He denied sustaining any specific injury or experiencing any numbness or tingling in his lower extremities.  [Tr. 302]

An x-ray of the plaintiff's lumbar spine revealed degenerative changes with small osteophytes and facet arthropathy.  [Tr. 307]  Rankin opined that the pain was likely musculoskeletal in nature, although Coogle did "have a component of right SI joint dysfunction."  [Tr. 305]  Rankin prescribed physical therapy, a course of steroids, and encouraged the plaintiff to work on weight loss.

- 3 -

Khaled Ziada, M.D., a physician located at the University of Kentucky Gill Heart Institute, was Coogle's treating cardiologist.  Ziada noted during a follow-up appointment in October 2015 that Coogle had "continued patency of LAD stent," an ejection fraction of 45 to 50 percent, and "lower extremity edema that responds to diuretic therapy and compressive stockings." [Tr. 762]  Ziada further noted that the plaintiff's complaints of fatigue and limited function may be "more related to body habitus and deconditioning rather than his cardiac condition."  Ziada released Coogle to return to work "with no specific restrictions" at that time. *Id.*

Ashley Guiliani, APRN, evaluated Coogle at the University of Kentucky Neuroscience Institute on November 6, 2015.  [Tr. 315-20]  Guiliani observed that Coogle had normal gait, with no weakness or spasticity.  [Tr. 316]  He had five-out-of-five strength rating with the exception of the right hip flexor, which was rated as four-out-of-five.  Guiliani felt that this strength deficit was pain dependent.  Coogle was also noted to have edema in both legs, right greater than left.

An MRI of the lumbar spine performed on October 6, 2015, showed evidence of facet arthropathy throughout the lumbar spine.  There was a mild disc bulge and thickening of the ligamentum flavum at the L3-4 and L4-5 level, but there was no evidence of nerve root impingement.  Guiliani concluded that neurosurgical intervention was not indicated.  [Tr. 316]  She recommended that Coogle continue physical therapy and stated that he may benefit from lumbar injections.  *Id.*

On November 30, 2015, Coogle established care with Michael Harned, M.D., a physician located at University of Kentucky Interventional Pain Associates.  [Tr. 502]  Harned performed a right sacroiliac joint injection in February 2016.  [Tr. 475]  Coogle later reported

that the procedure relieved his pain for 24 to 48 hours but he then returned to baseline.  [Tr. 465]  Harned planned to perform a right sacral radiofrequency rhizotomy, based on Coogle's initially favorable response to the injection.  [Tr. 469]  Coogle was required to discontinue blood thinning medication prior to the procedure, which was performed on May 12, 2016.  [Tr. 459-64]  Subsequent notes indicate that Coogle resumed taking his anticoagulant but later discontinued it again on July 20, 2016, prior to a spinal nerve ablation on July 27, 2016.  [*See* Tr. 1002.]  Coogle also continued physical therapy, having attended 85 sessions by July 6, 2016.  [Tr. 553]

The plaintiff collapsed while shopping on August 4, 2016, and was taken to the emergency department for an apparent hypoglycemic seizure.  However, emergency providers suspected a heart attack and sent him to the catheterization lab for evaluation.  [Tr. 584-85]  Coogle was diagnosed with an ST-elevation myocardial infarction and a drug eluting stent was placed in the mid-left anterior descending artery.  [Tr. 590]

Following a brief hospitalization, Coogle followed-up on August 16, 2016, with Stephanie Copher, APRN, at Dr. Ziada's office.  [Tr. 738-42]  Copher noted that Coogle's ejection fraction during his hospitalization was 40 to 50 percent and he was scheduled to begin cardiac rehabilitation the following day.  [Tr. 738]  Rana Lindsey, APRN, noted during a September 27, 2016 follow-up that Coogle's coronary artery disease was stable and he had no complaints of chest pain or shortness of air with exertion.  [Tr. 737]  But Coogle still complained of fatigue in December 2016.  However, Dr. Gill's office did not think the issue was related to his heart.  [Tr. 731]

The plaintiff resumed care with Dr. Harned on September 13, 2016.  [Tr. 998]  Harned noted that Coogle "may not be a good candidate for interventional therapies" going forward

due to his inability to temporarily discontinue anticoagulant medication.  [Tr. 1002]  Harned stated that he would insure that Coogle had a "close follow-up with his cardiologist" if any interventional therapies were planned.

Coogle returned for a follow-up appointment with Dr. Harned in December 2016.  [Tr. 1004]  He rated his low back pain as a two out of ten, and a six out of ten at worst.  He used a TENS unit for short-term relief of pain, was participating in cardiac rehab, and had lost some weight.  Further, he had achieved some degree of pain relief and improved function by using tramadol.  While Coogle had an antalgic gait with restricted lumbar range of motion, his lower extremity strength was graded as five-out-of-five throughout.  [Tr. 1008]

Harned did not plan to administer additional radiofrequency thermocoagulation procedures until the plaintiff discontinued blood thinning medication.  [Tr. 1015]  However, Coogle was a candidate for trigger point injections, which posed a low risk for bleeding.  Coogle indicated that he wanted to go forward with that procedure.  Harned prescribed tramadol and performed trigger point injections to the lumbar paraspinous muscles on December 20, 2016.  [Tr. 1015-18]

The plaintiff had a second neurosurgical evaluation at the University of Kentucky Neuroscience Institute on April 18, 2017.  [Tr. 898-902]  Coogle complained of chronic right low back pain that was beginning to progress to the left side.  Guiliani noted that there were no significant radicular symptoms, however, and there was no need for a new MRI.  [Tr. 899]  Regardless, she stated, Coogle would not be an ideal candidate for surgery based on his cardiac history and anticoagulant therapy.  She recommended that he continue working with the pain management specialist and follow-up with neurosurgery if radicular symptoms developed.  *Id.*

- 6 -

Coogle also treated with Stephanie Rose, M.D., for weight loss management.  [Tr. 942-69]  Rose worked with Coogle regarding lifestyle and diet modifications and it appears that he lost a modest amount of weight.  As of May 23, 2017, however, Coogle reported that he still had been unable to enroll in an exercise program due to back pain.  [Tr. 970]

Agency consultant Robert Culbertson, M.D., reviewed Coogle's file on December 6, 2016.  [Tr. 72-75]  Culbertson opined that Coogle's medically determinable impairments could reasonably be expected to produce his pain, but that the intensity, persistence, and limiting effects alleged were not substantiated by objective medical evidence.  [Tr. 72]  He concluded that Coogle had the ability to occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; and stand, sit, and/or walk about six hours in an 8-hour workday.  [Tr. 73]  Culbertson also believed that Coogle had an unlimited ability to push and/or pull, including the operation of hand and/or foot controls.  He reported that Coogle could frequently stoop, kneel, crouch, and climb ramps and stairs.  [Tr. 74]  Culbertson believed Coogle could occasionally crawl and climb ladders, ropes, and scaffolds.  Finally, he reported that Coogle should avoid concentrate expose to hazards and vibration.

All of these limitations were based on the plaintiff's diagnoses of obesity, coronary artery disease, and degenerative disc disease.  Culbertson noted that Coogle's allegations of complete disability were undermined by medical records indicating he had normal gait, normal strength, and normal sensation.  [Tr. 75]

Agency consultant Douglas Back, M.D., reviewed the plaintiff's file upon reconsideration on February 14, 2017.  [Tr. 79-90]  Back agreed that Coogle's impairments could be expected to cause pain, but not to the extent he claimed.  Specifically, Black believed Coogle's ability to perform activities of daily living was inconsistent with the allegations of

totally disabling pain.  Further, Back noted that Coogle's ejection fraction was 55 percent after his first heart attack.  During his hospitalization for the second heart attack, it had dropped to 40 to 50 percent.  However, there was nothing to suggest that Coogle would not recover and "continue to function at the level of the previous initial assessment."  [Tr. 89]  Accordingly, Back affirmed Culbertson's findings.

Mary Ellen Diriam, M.D., Ph.D., reviewed Coogle's records on behalf of Liberty Mutual Insurance in June 2017.  [Tr. 1059]  Diriam concluded that, "[i]n light of the nature, severity, and course of the medical condition(s) as described in the medical records reviewed[,] it would not be expected that [Coogle] could achieve the stability, strength, and stamina to carry out even sedentary level work on a reliable and sustained basis" before the end of September 2017.  Diriam asked Dr. Harned to make any necessary comments or corrections and return the report to her.  On July 14, 2017, Harned commented, "[Patient] will need continued treatments to maintain [maximum medical improvement] including injections, medication, [and] physical therapy."  *Id.*

Agency consultant Benjamin Cortijo, M.D., provided Residual Functional Capacity Assessment on February 16, 2018.  [Tr. 1060-67]  Cortijo concluded that Coogle could lift up to ten pounds, either frequently or occasionally.  [Tr. 1061]  He believed Coogle could stand and/or walk at least two hours in an eight-hour workday and that he could sit for a total of six hours in an eight-hour workday.  Cortijo opined that Coogle had an unlimited ability to push and/or pull, subject to the limitations for lifting and carrying.

With respect to postural limitations, Cortijo found that Coogle could occasionally climb, balance, stoop, kneel, crouch, and crawl.  [Tr. 1062]  Further, Cortijo noted that Coogle

had no manipulative, visual, or communicative limitations.  Cortijo opined that Coogle should avoid hazards such as machinery and heights due to decreased endurance.  [Tr. 1064]

Cortijo noted that the MRI of Coogle's lumbar spine revealed degenerative disc disease, arthritis, and evidence of sacroiliac joint dysfunction.  [Tr. 1062]  He observed that Coogle had a history of heart attack, coronary artery disease, and placement of a stent.  While Coogle's musculoskeletal exam had been normal and his gait independent, his endurance was poor and his balance was fair.  Cortijo reported that the limitations he recommended were consistent with Coogle's cardiac history, effects of obesity, and pain in the lumbar region.

ALJ Bowling determined that Coogle had the following severe impairments: acute myocardial infarction; chronic heart failure; disorders of the spine; and morbid obesity.  [Tr. 13]  After considering the entire record, he determined that Coogle had the functional residual capacity ("RFC") to perform sedentary work as defined in 20 C.F.R. § 404.1567(a), except he could

> occasionally lift or carry 10 pounds; the claimant can frequently lift or carry less than 10 pounds; the claimant can sit for 6 hours in an 8-hour workday, but for no more than 30 minutes at a time; the claimant can stand or walk for 2 hours in an 8-hour workday, but for no more than 30 minutes a time; the claimant can push or pull equal to the claimant's lift and carry amounts; the claimant can only occasionally climb ladders, ropes and scaffolds; the claimant can only occasionally climb ramps and stairs; the claimant can only occasionally stoop, kneel, crouch, and crawl; the claimant should avoid even moderate exposure to vibrations and to hazards such as the use of moving machinery and to unprotected heights.

[Tr. 14]  The ALJ concluded that Coogle could not perform his past work, which was considered medium exertion work.  [Tr. 18]  But based on the vocational expert's testimony, there were jobs existing in significant numbers in the national economy that he could perform.

[Tr. 18-19]  Accordingly, the ALJ determined that Coogle was not disabled under the Social Security Act.

## III.

A "disability" under the Social Security Act is defined as "the inability to engage in 'substantial gainful activity' because of a medically determinable physical or mental impairment of at least one year's expected duration." *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007) (citing 42 U.S.C. § 423(d)(1)(A)).  A claimant's Social Security disability determination is made by an ALJ in accordance with "a five-step 'sequential evaluation process.'" *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642 (6th Cir. 2006) (en banc).  If the claimant satisfies the first four steps of the process, the burden shifts to the Commissioner with respect to the fifth step.  *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003).

A claimant must first demonstrate that he is not engaged in substantial gainful employment at the time of the disability application.  20 C.F.R. § 404.1520(b).  Second, the claimant must show that he suffers from a severe impairment or a combination of impairments.  20 C.F.R. § 404.1520(c).  Third, if the claimant is not engaged in substantial gainful employment and has a severe impairment which is expected to last for at least twelve months and which meets or equals a listed impairment, he will be considered disabled without regard to age, education, and work experience.  20 C.F.R. § 404.1520(d).  Fourth, if the claimant has a severe impairment but the Commissioner cannot make a determination regarding disability based on medical evaluations and current work activity, the Commissioner will review the claimant's RFC and relevant past work to determine whether he can perform his past work.  20 C.F.R. § 404.1520(e).  If he can, he is not disabled.  20 C.F.R. § 404.1520(e).

- 10 -

Under the fifth step of the analysis, if the claimant's impairments prevent him from doing past work, the Commissioner will consider his RFC, age, education, and past work experience to determine whether he can perform other work.  If he cannot perform other work, the Commissioner will find the claimant disabled.   20 C.F.R.  §  404.1520(g).   "The Commissioner has the burden of proof only on 'the fifth step, proving that there is work available in the economy that the claimant can perform.'"  *White v. Comm'r of Soc. Sec.*, 312 F. App'x 779, 785 (6th Cir. 2009) (quoting *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999)).

This Court's review is limited to determining whether the ALJ's findings are supported by substantial evidence and whether the ALJ applied the proper legal standards in reaching his decision.  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).   Substantial evidence is such relevant evidence as reasonable minds might accept as sufficient to support the conclusion.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007).   The Commissioner's findings are conclusive if they are supported by substantial evidence.  42 U.S.C. § 405(g).

**IV.**

**A.      The ALJ Did Not Err in Considering Whether the Plaintiff Met the Listing for Chronic Heart Failure.**

The plaintiff argues that the ALJ "should have considered in more detail" whether his impairments satisfied Listing 4.02 (chronic heart failure).  *See* 20 C.F.R. Part 404, Subpart P, App'x 1.  However, Coogle has failed to identify any legal standard that the ALJ failed to apply or otherwise establish that his decision regarding the listing was not supported by substantial evidence.

The plaintiff bears the burden of proving that he meets or equals a listing. *Burress v. Secretary*, 835 F.2d 139 (6th Cir. 1987). To satisfy that burden, the plaintiff must point to specific medical findings that satisfy all of the criteria of the listing. *See Elam ex rel. Golay v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003); *Mortzfield v. Comm'r of Soc. Sec.*, 2014 WL 1304991, at *14 (E.D. Mich. Mar. 31, 2014).

Chronic heart failure (Listing 4.02) is defined as follows:

Chronic heart failure while on a regimen of prescribed treatment, with symptoms and signs described in 4.00D2. The required level of severity for this impairment is met when the requirements in *both A and B* are satisfied.

**A.**     Medically documented presence of one of the following:
1.     Systolic failure (see 4.00D1a(i)), with left ventricular end diastolic dimensions greater than 6.0 cm or ejection fraction of 30 percent or less during a period of stability (not during an episode of acute heart failure); or

2.     Diastolic failure (see 4.00D1a(ii)), with left ventricular posterior wall plus septal thickness totaling 2.5 cm or greater on imaging, with an enlarged left atrium greater than or equal to 4.5 cm, with normal or elevated ejection fraction during a period of stability (not during an episode of acute heart failure);  AND

**B.**     Resulting in one of the following:

1.     Persistent symptoms of heart failure which very seriously limit the ability to independently initiate, sustain, or complete activities of daily living in an individual for whom an MC, preferably one experienced in the care of patients with cardiovascular disease, has concluded that the performance of an exercise test would present a significant risk to the individual; or

2.     Three or more separate episodes of acute congestive heart failure within a consecutive 12-month period (see 4.00A3e), with evidence of fluid retention (see 4.00D2b(ii)) from clinical and imaging assessments at the time of the episodes, requiring acute extended physician intervention such as hospitalization or emergency room treatment for 12 hours or more, separated by periods of stabilization (see 4.00D4c); or

3.     Inability to perform on an exercise tolerance test at a workload equivalent to 5 METs or less due to:

a.     Dyspnea, fatigue, palpitations, or chest discomfort; or

b.      Three or more consecutive premature ventricular contractions (ventricular tachycardia), or increasing frequency of ventricular ectopy with at least 6 premature ventricular contractions per minute; or

c.      Decrease of 10mmHg or more in systolic pressure below the baseline systolic blood pressure or the preceding systolic pressure measured during exercise (see 4.00D4d) due to left ventricular dysfunction, despite an increase in workload; or

d.      Signs attributable to inadequate cerebral perfusion, such as ataxic gait or mental confusion.

The plaintiff contends that he met Part A of the listing when his January 23, 2015, echocardiogram measured his left ventricular internal diameter end diastole at 6.3 cm.  [Record No. 15-1, p. 10]  However, this was less than three weeks after his first heart attack and cannot be characterized as a period of stability.  [*See* Tr. 859-60.]  Further, to meet Listing 4.02, other conditions must be satisfied, as outlined above.

Coogle speculates that he would have been unable to perform on an exercise tolerance test at a workload equivalent to 5 METs and, therefore, would have met the listing.  [Record No. 15-1, p. 11]  However, he bears the burden of proving his disability and does not point to any evidence he offered to satisfy this portion of the listing.  Further, there is nothing to indicate that Coogle requested an exercise tolerance test or otherwise raised the issue at the administrative level.

The Commissioner is not required to purchase an exercise test in every case.  Instead, he considers whether to purchase an exercise tolerance test when:

(i)  There is a question whether your cardiovascular impairment meets or medically equals the severity of one of the listings, or there is no timely test in the evidence we have (see 4.00C9), and we cannot find you disabled on some other basis; or

(ii)  We need to assess your residual functional capacity and there is insufficient evidence in the record to make a determination or decision.

- 13 -

20 C.F.R. Part 404 subpart P, app. 1, listing 4.00C6.  The Commissioner will not purchase an exercise tolerance test when he can make a determination based on the evidence already in the record.  *Id.*

The record contained ample evidence concerning the plaintiff's ability to perform physical activity.  The plaintiff participated in work conditioning, cardiac rehabilitation, and a lengthy course of physical therapy.  By December 2016, the plaintiff reported to his cardiologist that he was participating in cardiac rehabilitation and had no chest pain, dyspnea, or tachycardia upon exertion.  [*See* Tr. 731]  The cardiologist believed that the plaintiff's fatigue was from newly-diagnosed hypothyroidism and was expected to resolve with medication.  *Id.*

The Court rejects Coogle's argument that the ALJ did not provide sufficient reasons that he failed to meet Listing 4.02.  The ALJ is not required to satisfy any "heightened articulation standard" when it comes to discussing whether a claimant meets a listing.  *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006) (citing 20 C.F.R. § 404.1526).  The ALJ explained that Coogle had failed to meet the listing, noting:

> The record does not establish the medical signs, symptoms, laboratory findings or degree of functional limitation required to meet or equal the criteria of any listed impairment, including listing 4.02 for chronic heart failure and 4.04 for ischemic heart disease.  Moreover, no acceptable medical source designated to make equivalency findings has concluded that the claimant's impairment(s) medically equal a listed impairment.

[Tr. 14]  Accordingly, this argument fails.

**B.    The ALJ's Did Not Err in Considering Coogle's Treatment for Low Back Pain.**

The record indicates that Coogle underwent a radiofrequency thermocoagulation procedure that required him to temporarily discontinue his anticoagulation medication. However, due to the risk of a recurrent heart attack, his doctors determined that he should not discontinue the blood thinner again.  [*See* Tr. 1015.]  Accordingly, he could not have a repeat of the radiofrequency thermocoagulation procedure, which was intended to reduce his pain. Coogle argues that the ALJ erred by failing to consider that that the plaintiff's anticoagulant medication "made it medically impossible for him to have procedures to repair or alleviate his lumbar problems."

The ALJ did not specifically discuss Coogle's inability to receive additional radiofrequency thermocoagulation procedures due to his medication.  However, ALJs are not required to discuss every piece of evidence in the record.  *Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 664 (6th Cir. 2004).  The plaintiff has not explained why discussion of this piece of evidence is vital to the ALJ's decision.  On December 12, 2016, Coogle reported to Dr. Harned that the previous radiofrequency procedure provided "marginal" pain relief.  [Tr. 1015] The plaintiff has not pointed to any evidence indicating that the available alternate means of pain relief were less effective than radiofrequency thermocoagulation. [1]

---

[1]  The plaintiff also attacks the ALJ's characterization of the radiofrequency procedure as "conservative treatment."  However, the plaintiff has neither provided a legal definition of "conservative treatment" nor explained why the ALJ's decision is unsupported by substantial evidence as a result of his use of that term.

### C. The ALJ Examined the Combined Effects of the Plaintiff's Impairments.

The Court also rejects the plaintiff's suggestion that the ALJ failed to examine the combined effects of his heart failure and back pain in combination. This argument is entirely conclusory and does not explain how the ALJ's opinion is deficient. In reviewing the opinion, however, there is nothing to suggest that he did not examine the combined effects of the plaintiff's impairments. First, the applicable law, which provides for analyzing the combined effects of all impairments, is stated correctly. [Tr. 11-12] Next, the ALJ described Coogle's severe and non-severe impairments, the accuracy of which the plaintiff does not challenge. [Tr. 13]

In fashioning the RFC, the ALJ "considered *all symptoms* and the extent to which [they] can reasonably be accepted as consistent with the objective medical evidence." [Tr. 14] Further, the plaintiff has not indicated how the combined effects of his impairments are not adequately accommodated by the RFC. Accordingly, the ALJ sufficiently considered the cumulative effects of his impairments. *See, e.g., Baker v. Astrue*, 2011 WL 4499354, at *4 (E.D. Ky. Sept. 26, 2011).

### D. The ALJ Did Not Err in Failing to Determine a Closed Period of Disability.

The plaintiff contends that the ALJ should have examined the record to determine whether he was disabled for "significant periods" within the four-year period at issue. [Record No. 15-1, p. 14] It is unclear that the plaintiff raised this issue earlier, but since the Commissioner does not argue that the plaintiff has forfeited it, the Court will consider the issue on the merits. *See, e.g., Robertson v. Berryhill*, 2017 WL 3574626, at *2 (W.D.N.Y. Aug. 18, 2017).

Coogle must provide evidence that he was continuously disabled for a period of twelve months to receive closed period benefits. *See Howse v. Heckler*, 782 F.2d 626 (6th Cir. 1986); *Nash v. Comm'r of Soc. Sec.*, 2019 WL 4751554, at *6 (W.D. Ky. Sept. 30, 2019). For the most part, he apparently expects the Court to take his word for it and remand the matter for further consideration. Coogle, however, has provided one example of a closed period for which he believes he is entitled to benefits. The plaintiff contends that "there should be little doubt" that he was disabled for the entirety of 2015, since he had a heart attack in January 2015 and "was not prepared to try a work-hardening program until August 2015, when he immediately was afflicted with back problems affirmed by diagnostic studies." [Record No. 15-1, p. 14] This is insufficient evidence to suggest that he was disabled for a 12-month period and does not warrant remand.

As the Commissioner has pointed out, the plaintiff's treating cardiologist opined that he could return to work in October 2015. While Coogle was experiencing increased back pain around this time, he has not pointed to any evidence suggesting that he was precluded from performing the sedentary activities included in the RFC. Following his November 2015 neurosurgical consultation, Ashley Guiliani, APRN, reported that Coogle had increased pain with standing and walking, and did not exhibit neurological symptoms. [Tr. 315] At that time, his pain was rated as two out of ten, but increased with activity. He obtained pain relief from the use of a TENS unit, physical therapy, and pain medication.

Put simply, Coogle has not identified evidence indicating that he was unable to sedentary work as identified in the RFC for a continuous period of 12 months.

- 17 -

E.      The ALJ's Decision is Supported by Substantial Evidence.

It is well-settled that a medical consultant's opinion may constitute substantial evidence in support of an ALJ's RFC determination. *Widener v. Astrue*, 2011 WL 3101102, at *3 (E.D. Ky. July 25, 2011). The ALJ summarized the medical evidence and explained the weight assigned to the various medical opinions before announcing the RFC. [Tr. 13-18]

The ALJ assigned partial weight to the 2017 opinions of consultants Douglas Back, M.D., and Robert Culbertson, M.D., who opined that the plaintiff should be limited to light work with non-exertional restrictions. The ALJ believed that their opinions were consistent with the medical evidence available at the time they were rendered, but more recent records reflected restrictions consistent with a sedentary exertion level. [Tr. 16-17] Accordingly, the ALJ assigned great weigh to the February 2018 opinion of Benjamin Cortijo, M.D., who opined that Coogle should be limited to sedentary work with non-exertional limitations. [Tr. 17] The ALJ noted that Cortijo's opinion was "balanced, objective, and consistent with the evidence as a whole," and he had extensive knowledge and familiarity with the DIB program.

Coogle argues that Cortijo's opinion cannot constitute substantial evidence because it states: "Limitations as proposed are as of 01-06-15," and Cortijo had "very little upon which to premise his opinion." [Record No. 15-1, p. 14] Although Cortijo's opinion indicates that the proposed limitations *begin* on January 6, 2015, there is no suggestion that he intended them to pertain to that single day. Such a conclusion would be nonsensical, especially in light of Cortijo's reference to Coogle's "old MI," which *occurred* on January 6, 2015. [*See* Tr. 1062.] And while Cortijo mentioned Coogle's cardiac history by way of physical therapy notes, there is nothing to indicate that Cortijo only reviewed the physical therapy notes and did not have access to the entire record through the date of his February 18, 2018 opinion.

Coogle has not identified any valid reason to discount the opinions relied upon. Further, he has not pointed to any evidence or medical opinion that conflicts with those relied upon by the ALJ.

## V.

Based on the foregoing, it is hereby

**ORDERED** as follows:

1.     Plaintiff William Coogle's motion for summary judgment [Record No. 15] is **DENIED**.

2.     Defendant Commissioner of Social Security's motion for summary judgment [Record No. 19] is **GRANTED**.

Dated: October 9, 2020.

Danny C. Reeves, Chief Judge
United States District Court
Eastern District of Kentucky